**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:15-cr-114 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| OSCAR TORBERT III (1), | : | |
| JENO DANIEL MOORE (2), | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING**
**DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE**

This criminal case is before the Court on Defendants' motions to suppress

evidence (Docs. 24, 26), the parties' pre-hearing responsive memoranda (Docs. 27, 28,

29), and the parties' post-hearing briefs (Docs. 32, 33, 35, 36).

The Court held an evidentiary hearing over the course of two days on May 6, 2016

and May 20, 2016, and heard testimony from two City of Norwood police officers,

Officers Ryan Strunk and Chadwick Webster.  (Docs. 30, 31).  The motions are now ripe

for decision.

## I.  BACKGROUND

On November 4, 2015, Defendants Oscar Torbert III and Jeno Daniel Moore were

charged by way of a four-count indictment with various firearm and drug trafficking

offenses, including:  possession with intent to distribute heroin, in violation of 21 U.S.C.

§ 841(a)(1) and (b)(1)(C) (Count 1); possession of a firearm in furtherance of a drug

trafficking offense, in violation of 18 U.S.C. § 924(c)(1) (Count 2); and possession of a

firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2)

(Counts 3 and 4).  The charges arise from evidence obtained by officers of the City of Norwood, Ohio Police Department (the "NPD") during a traffic stop and subsequent vehicular search.  (Docs. 24 at 2, 26 at 2).  Defendants move for suppression of said evidence, arguing, in large part, that it was obtained without the benefit of a warrant and in violation of their constitutional rights.  (Docs. 24, 26).

For purposes of this Order, the Court will rely upon the facts as set forth in the parties' briefs (Docs. 24, 26, 27, 28, 29, 32, 33, 35, 36), as well as the testimony and evidence proffered at the May 6 and May 20, 2016 suppression hearings.[1]

## II.  FACTS

On May 30, 2015, shortly after 5:00 p.m., Defendant Torbert was driving a motor vehicle in Norwood, Ohio, with Defendant Moore in the front passenger's seat.  (Doc. 24 at 1).  The vehicle caught the attention of Officer Ryan Strunk of the NPD, who first observed the vehicle while it was stopped at a red light on Northcutt Avenue, facing eastbound, preparing to make a left turn onto Section Avenue.[2]  (Doc. 27 at 1-2; Doc. 30 at 15).  At the time, Officer Strunk was in his police cruiser, in a parking lot directly across the street.  (Def. Ex. 6).  Officer Strunk noted that he could not see into the interior

---

[1] During the evidentiary hearing, the Government and Defendants submitted body camera footage from two of the officers on the scene.  (Def. Exs. 1 and 2; Gov. Ex. 1).  While the footage submitted is identical, the exhibits differ in terms of formatting.  In order to ensure consistency and specificity, the Court cites throughout this Order to "Webster Camera" and "Devers Camera" followed by the time reflected in minute and seconds.

[2] At the time of this incident, Officer Strunk had only recently graduated from the police academy and completed his field training.  (Doc. 30 at 7-8, 50).  Officer Strunk testified that he attended the Great Oaks Police Academy from July to November 2014.  (*Id*. at 7).  Thereafter, he was employed by the NPD and began his three-month field training process in February 2015, which he completed in May 2015.  (*Id*. at 50).  Thus, by Officer Strunk's estimation, he had been on the job for approximately two weeks on the day of this traffic stop.  (*Id*.)

of the vehicle, which, based upon his observations, he believed to be the result of unlawful tinting on the front windshield and the side windows.  (*Id*.; Doc. 30 at 15).

Accordingly, Officer Strunk began following the vehicle and activated his emergency lights in order to effectuate a traffic stop.  (Doc. 30 at 15).  However, the vehicle did not stop immediately.  (*Id*.)  Instead, the driver of the vehicle made a left turn at the next intersection onto Andina Avenue and began accelerating in speed.  (*Id*. at 15-16).  Officer Strunk then activated his sirens and communicated by radio that he was attempting to pull over a vehicle that was refusing to stop.  (Def. Ex. 6; Doc. 30 at 46).  However, the vehicle ultimately pulled to the curb after approximately one and a half blocks and parked in a residential neighborhood.  (Doc. 30 at 17).  Officer Strunk pulled up behind the stopped vehicle.  (*Id*.)  During the suppression hearing, both officers confirmed that the vehicle was legally parked and could have remained in that location without incurring a parking ticket.  (*Id*. at 47-48; Doc. 31 at 27).

Officer Strunk exited his police cruiser and began approaching the vehicle from the driver's side.  (Def. Ex. 6).  Officer Strunk testified that he had not run a check on the vehicle's license plate number prior to approaching.  (Doc. 30 at 53).  Accordingly, he had no information regarding the registered owner of the vehicle or the vehicle's potential occupants.  (*Id*.)  As Officer Strunk was approaching, the driver's side door of the vehicle opened and the driver, Defendant Torbert, leaned out to announce that he could not roll down his car window.  (Def. Ex. 6).  Officer Strunk instructed the driver to remain inside the car.  (*Id*.)  Once near the vehicle, Officer Strunk also observed an individual sitting in the front passenger's seat, later identified as Defendant Moore.  (*Id*.)

3

Officer Strunk explained to Defendants that he had stopped the vehicle for excessive window tints. (*Id*.) He then inquired as to why Defendant Torbert had not immediately pulled over. (*Id*.) Officer Strunk noted that Defendant Torbert became nervous and could not offer a direct answer. (*Id*.) Officer Strunk then asked Defendants where they were going. (*Id*.) Defendant Torbert stated that they were on their way to a barbershop and indicated that it was located back on Section Avenue. (*Id*.) This response prompted Officer Strunk to question Defendant Torbert as to why he had turned off of Section Avenue and was now driving in the wrong direction. (*Id*.) Defendant Torbert replied that he was just driving around. (*Id*.)

Officer Strunk then asked Defendant Torbert for his identification. (*Id*.) As Defendant Torbert was producing his identification, Officer Strunk noticed Defendant Moore was not wearing a seatbelt and asked him for his identification as well.[3] (*Id*.) Officer Strunk then returned to his vehicle and ran both Defendants' identifications using his mobile data computer ("MDC"). (*Id*.) As a result, Officer Strunk learned that Defendant Torbert was under a non-compliance suspension and that Defendant Moore only had an Ohio identification card.[4] (*Id*.) In short, neither Defendant Torbert, nor Defendant Moore had a valid driver's license.

---

[3] It would appear that Defendant Moore was never cited for this violation.

[4] A "non-compliance" suspension, also referred to as an FRA suspension, indicates that a person's driver's license has been suspended for failure to maintain financial responsibility. Ohio Rev. Code § 4509.101. If the person is subsequently found to be operating a motor vehicle while still under the FRA suspension, the resulting offense is an unclassified misdemeanor, in the first instance, and the statute specifies that "the offender shall not be sentenced to a jail term …." Ohio Rev. Code § 4510.16(D)(1).

4

While Officer Strunk was running Defendants' identifications, his partner, Officer Chadwick Webster, arrived on the scene to assist.  (Webster Camera at 0:20).  Officer Strunk testified that Officer Webster arrived approximately two to three minutes after the stop was initiated.  (Doc. 30 at 48).  Further, Officer Strunk testified that Officer Webster's arrival was pursuant to NPD policy, which calls for available units to be dispatched immediately as back-up at the scene of any traffic stop.  (*Id.*)

Upon his arrival, and before approaching the stopped vehicle, Officer Webster went to Officer Strunk, who was still seated in his police cruiser.  (Webster Camera at 0:35).  The officers conferred regarding the traffic stop and the circumstances that presented.  (*Id.*)  Officer Strunk advised Officer Webster that Defendant Torbert was "suspended."  (*Id.* at 0:47).  In response, Officer Webster told Officer Strunk to "get him [Defendant Torbert] out in cuffs, search him real good."[5]  (*Id.*)

Officer Webster then asked about the passenger of the vehicle, to which Officer Strunk replied, "He's good.  Doesn't have anything."  (*Id.* at 0:52).  Finally, Officer Webster asked Officer Strunk who the registered owner of the vehicle was, and Officer Strunk replied "Jasmine [Moore]."  (*Id.* at 1:00).  Officer Webster then told Officer Strunk, "Make sure you keep good control of this guy," presumably referring to Defendant Torbert.  (*Id.* at 1:07).

---

[5] Officer Webster testified that his intent in stating "search him real good," was for Officer Strunk to conduct a full and thorough search of Defendant Torbert's person (including removing all items in Defendant Torbert's pockets), rather than a pat-down search to feel for contraband or weapons.  (Doc. 31 at 11).

Officers Strunk and Webster approached the vehicle from the driver's side and passenger's side, respectively.  (*Id*. at 1:10).  Officer Strunk immediately asked Defendant Torbert to exit the vehicle and placed him in handcuffs.[6]  (*Id*. at 1:26).  Concurrently, Officer Webster engaged Defendant Moore and asked whether he had a valid driver's license.  (*Id*. at 1:45).  Defendant Moore stated that he did not have a valid license, but explained that he could have "his girl" come to pick up the car or that he could simply leave the car parked.  (*Id*. at 1:45-1:53; Doc. 31 at 13-14).

Officer Webster then asked Defendants "Whose car is this?" to which Defendant Torbert replied, "His [Defendant Moore's] sister's."  (Webster Camera at 2:01).  Officer Webster then asked Defendant Moore for his sister's name, and Defendant Moore responded, "Jasmine Moore."  (*Id*. at 2:06).  Officer Webster did not hear the response

---

[6] Although the matter of Defendant Torbert's physical detention is not presently at issue, the Court would be remiss in not addressing Officer Strunk's testimony in that regard.

Officer Strunk testified that he believed he had a lawful right, during the course of a traffic stop, to handcuff and physically detain every person driving under a suspended license, without any particularized consideration for the context or circumstances and without differentiating for the various types of license suspensions.  (Doc. 30 at 61-63).  Indeed, Officer Strunk testified that he had conducted numerous traffic stops where the driver was found to be operating a vehicle under an FRA suspension—which offense he fully acknowledged is, for the most part, an unclassified misdemeanor carrying no jail time—and that he had in fact, as a matter of course, and without exception, <u>handcuffed and physically detained every one of those individuals while he completed the traffic stop</u>.  (*Id*.)  Officer Strunk stated that he could not recall ever arresting (versus temporarily detaining) a person for driving under an FRA suspension, and further confirmed that he has, on various occasions, allowed such suspended drivers to simply park their vehicles lawfully and leave with a mere citation or warning after the traffic incident is completed.  (*Id*. at 62-64).

Frankly, this Court is aghast at the notion that any police officer is under the impression that it is perfectly acceptable to so casually deprive citizens of their freedom and dignity, or to adopt a practice of physically restraining individuals for an offense that essentially amounts to little more than failing to renew their car insurance.

and, accordingly, repeated the question, which appeared to have confused Defendant Moore, prompting the officers to repeat the question again. (*Id*.) Despite these difficulties, however, the owner of the vehicle was identified to the officers as Defendant Moore's sister, and her name, Jasmine Moore, was repeated by one or both of the defendants no less than three times during the brief fifteen-second exchange with the officers. (*Id*. at 2:01-2:18).[7]

Officer Strunk walked Defendant Torbert to the rear driver's side door of Officer Strunk's police cruiser and proceeded to conduct a search of Defendant Torbert's person. (*Id*. at 2:19). Officer Webster followed, leaving Defendant Moore seated in the car. (*Id*. at 2:19). While Officer Strunk conducted the search, Officer Webster went to the front passenger's side of Officer Strunk's cruiser and checked the MDC. (*Id*. at 2:39). Thereafter, Officer Webster walked toward Officer Strunk who was concluding his search of Defendant Torbert. (*Id*. at 3:14). Officer Strunk commented on the amount of cash Defendant Torbert had (presumably in Defendant Torbert's pockets). (*Id*. at 3:20). Upon completing his search of Defendant Torbert, Officer Strunk placed Defendant Torbert, still handcuffed, in the back of his police cruiser. (*Id*. at 3:30).

Officers Strunk and Webster then walked to the rear of the police cruiser and discussed how they intended to proceed. (*Id*. at 3:30). Officer Webster suggested to

---

[7] Officer Strunk testified that he thought Defendants were indicating that Jasmine Moore was Defendant Torbert's sister. (Doc. 30 at 29). Regardless, the body camera footage evidences that Defendants stated repeatedly the owner of the vehicle was Defendant Moore's sister, Jasmine Moore. (Doc. 31 at 14-15). Further, Officer Webster testified that he used the MDC to confirm the vehicle owner's information shortly thereafter, and that he did not recall seeing anything to contradict Defendants' statements. (*Id*. at 18, 21).

Officer Strunk that he should have the vehicle towed based on Defendant Torbert's FRA suspension, as well as Defendants' alleged difficulty in communicating the registered owner of the vehicle (which Officer Webster described to Officer Strunk as Defendants "playing games"). (*Id*. at 3:42). Officer Webster then informed Officer Strunk, "I don't know if you realized it, but there's a sandwich bag thing right in the middle there." (*Id*. at 3:50). Officer Strunk had not noticed. (*Id*.) Officer Webster then clarified that they were in the center console area.[8] (*Id*.) Officer Webster further elaborated during his testimony that he specifically saw in the center console of the vehicle one box of sandwich bags, which box was open such that Officer Webster could see the smooth surface of the unused bags inside. (Doc. 31 at 23). Moreover, Officer Webster testified that none of the sandwich bags were strewn about the vehicle and that, other than the mere presence of a box of sandwich bags, he did not observe anything else that caught his attention. (*Id*. at 23-25).

Officer Webster told Officer Strunk to get Defendant Moore out of the car and "try to get consent to search him … and then we're going to do an inventory search." (Webster Camera at 4:07). Officer Webster further instructed Officer Strunk to notify Defendant Moore that the car would be towed because no licensed driver was present. (*Id*.) At the suppression hearing, Officer Webster confirmed that the officers did have options available to them short of towing the vehicle, including leaving the car parked (as

---

[8] Officers Strunk and Webster testified that the presence of sandwich bags was significant, because it indicated drug trafficking activity (*i.e.*, packaging small quantities of narcotics for sale). (Doc. 30 at 77; Doc. 31 at 72, 76). Specifically, drugs are filled in the corner of the bag and then the end of the bag is knotted and the excess torn off. (Doc. 30 at 77).

Defendant Moore had earlier suggested) or contacting the registered owner of the vehicle. (Doc. 31 at 35-36). Officer Webster testified, however, that the decision was made to forego any alternative options entirely, because the officers wanted to conduct an inventory, thereby allowing them to search the car. (*Id*.)

As instructed by Officer Webster, Officer Strunk approached the vehicle and asked Defendant Moore to step outside. (Webster Camera at 4:20). Officer Strunk twice assured Defendant Moore that he was not in any trouble. (*Id*. at 4:30, 4:46). Officer Strunk obtained Defendant Moore's consent to search his person. (*Id*. at 4:40). Unlike Defendant Torbert, Defendant Moore was not placed in handcuffs for the search. (*Id*.) Officer Strunk immediately proceeded to reach in and empty Defendant Moore's pockets (as opposed to conducting a pat-down search). (*Id*. at 4:44). Officer Strunk asked Defendant Moore how much money he had on him and noted that Defendant Moore was in possession of three cellular telephones. (*Id*. at 5:00). While Officer Strunk conducted his search of Defendant Moore, Officer Webster proceeded to walk around the perimeter of the stopped vehicle. (*Id*. at 4:45-4:58). Notably apparent are the darkened windows and front windshield of the vehicle. (*Id*.)

After Officer Strunk finished searching Defendant Moore, he asked Officer Webster to begin arranging a tow of the vehicle. (*Id*. at 5:22). Officer Webster walked to his police cruiser to obtain the necessary paperwork, leaving Officer Strunk and Defendant Moore standing on the sidewalk next to the stopped vehicle. (*Id*.) Upon finding the paperwork in his cruiser, Officer Webster walked back toward the vehicle and

9

took Officer Strunk's place on the sidewalk next to Defendant Moore while Officer

Strunk began the inventory search of the vehicle.[9]  (*Id*. at 6:40).

Officer Strunk testified during the suppression hearing that the search of the

vehicle was indeed conducted under the authority of an inventory search.  (Doc. 30 at 31-

36).  During their testimony, both officers confirmed that the NPD conducts

impoundment and inventory searches according to the NPD General Order, Policy #

61.4.3, entitled "Towing and Impounding Vehicles," (the "NPD tow policy") (Def. Ex.

3), which has been approved and implemented by NPD Chief William Kramer.  (Doc. 30

at 31-37, 98-100; Doc. 31 at 28-32).  The officers further acknowledged that the NPD

tow policy specifies its purpose as follows:

> It is the policy of the Norwood Police Department to tow and
> impound vehicles in compliance with existing law, to ensure
> the protection of personal property in the impounded vehicle,
> and to protect the Norwood Police Department from
> unwarranted claims of lost property.

(Def. Ex. 3 at 2).  Indeed, in being asked what the purpose of an inventory search was,

Officer Webster replied that it was "to look for valuable items in the vehicle so if

anything was to happen at the tow yard, or things along those lines, we [the NPD] would

have accountability of those items."  (Doc. 31 at 65).  He further confirmed that inventory

searches, "[a]bsolutely" served a "safekeeping" function.  (*Id*.)

---

[9] Defendant Moore and Officer Webster had a brief conversation, during which Defendant
Moore asked whether Defendant Torbert would be taken to jail.  (Webster Camera at 7:16).
Officer Webster did not answer directly, but stated that Defendant Torbert does not have a valid
driver's license and "that's why he's getting held on to."  (*Id*.)

For approximately three minutes, Officer Strunk searched the vehicle, while Officer Webster stood on the sidewalk with Defendant Moore. (Webster Camera at 6:40-9:30). During that time, Officer Strunk's search focused solely on the driver's seat area of the vehicle. (*Id.*; Doc. 30 at 70). Thereafter, a third officer, Officer Kenneth Devers, arrived on the scene to assist. (Doc. 31 at 45). Upon Officer Devers' arrival, Officer Webster joined Officer Strunk to search the vehicle. (Webster Camera at 9:30).

Officer Webster began searching the interior of the vehicle from the passenger's side, while Officer Strunk continued his search on the driver's seat. (*Id.* at 9:50). Officer Webster utilized a flashlight during his search and can be seen checking the center console, looking in the cup holders, pulling up on the center paneling (attempting to lift it out of place), and searching through the glove compartment. (*Id.* at 9:50-10:05). <u>Officer Webster confirmed during his testimony that his search was specifically focused toward locating contraband that may be hidden in the vehicle</u>. (Doc. 31 at 49-51).

During the search, Officer Strunk expressed to Officer Webster his belief that Defendants were likely engaged in drug trafficking, stating, "I'd say he's got drugs and cash on him," to which Officer Webster replied, "Oh I definitely think something's up." (*Id.* at 10:06). Officer Strunk attributed his inclination to the amount of cash Defendants had on hand, as well as Defendant Torbert's initial reluctance to stop the vehicle. (*Id.*) Officer Webster noted that the presence of the box of sandwich bags alone gave him pause. (*Id.* at 10:18). Officer Webster then reached into the box and removed two knotted, torn off sandwich bags, before proceeding to pull out all of the sandwich bags (most of which were intact), thereby revealing an additional torn bag. (*Id.* at 10:18-

11

10:42). <u>Officer Strunk testified that Officer Webster's thorough search of the sandwich bag box was done in furtherance of the inventory search.</u>[10] (Doc. 30 at 35).

Next, Officer Webster reached under the front passenger's seat briefly, but found nothing. (Webster Camera at 10:44). He then moved to the interior paneling along the side of the front passenger's leg area. (*Id.* at 10:45). Officer Webster ran his hand along the bottom of the paneling and pulled up, causing it to come off in his hand. (*Id.* at 10:46). Upon removing the panel, Officer Webster announced, "Here it is, right here." (*Id.* at 10:48). He then pulled out a small plastic bag containing a substance presumed to be heroin.[11] (*Id.*) Officer Webster told Officer Strunk to handcuff Defendant Moore. (*Id.* at 10:56). While Officer Strunk was placing Defendant Moore under arrest, Officer Webster continued his search and also found a firearm and a scale in the same hidden panel compartment.[12] (*Id.* at 11:20).

Officer Webster then asked Officer Devers, who had arrived at the scene just minutes earlier, to take pictures of the evidence. (*Id.* at 11:25). As to the evidence, Officer Webster informed Officer Devers, "I popped that panel off. It's in there." (*Id.* at 11:29). Officer Webster later explained to Officer Devers that the panel "came off real easy." (*Id.* at 13:32). He also told Officer Strunk that he ran his hand along the panel because it appeared to be sticking out and was slightly "ajar," which caught his attention.

---

[10] Such statements severely undermine the officers' credibility.

[11] The suspected narcotics were later tested and determined to be a heroin fentanyl mixture. (Doc. 27 at 4).

[12] Officer Webster testified that upon finding the suspected narcotics behind the panel, the search became one based upon probable cause rather than merely an inventory search. (Doc. 31 at 78).

(*Id*. at 26:10). During his testimony, <u>Officer Webster confirmed that the location behind the interior plastic paneling is **not** an area where individuals typically store personal property, unless their intent is to conceal the items</u>. (Doc. 31 at 60-61).

While taking pictures, Officer Devers noticed a second firearm and more drugs in the hidden compartment. (Devers Camera at 1:42, 2:14, 2:35). Officer Webster inspected both firearms (a Keltec and a Bersa) at the scene, confirming that they were both loaded and had one round in the chambers.[13] (Webster Camera at 14:10, 14:28). Additional items were also found in the vehicle prior to impoundment, including cash and cellular telephones. (*Id*. at 18:25, 40:00). Ultimately, the drugs, the scale, and both firearms were found in the hidden panel compartment, the sandwich bags were found in the center console area of the vehicle, at least seven cellular telephones were found in Defendants' pockets and in the driver's side door storage area, a large amount of cash was found in Defendants' pockets and in between the car seats, and the keys to the vehicle were found on Defendant Moore's keychain.

Officer Devers completed the vehicle impound report, which he confirmed with Officers Webster and Strunk before finalizing. (Devers Camera at 8:00, 20:35). The final impound report was signed by Officer Webster. (Def. Ex. 8). Under "Reason for Impoundment," the officers listed "Driver Arrested." (*Id*.) Moreover, under "Remarks & Inventory of Personal Property in Vehicle," the officers listed "2 Pistols, Digital Scale, 2 Bag Containing Brown Substance, Sandwich Baggies." (*Id*.) **The officers did not list**

---

[13] DNA evidence strongly suggests that Defendant Torbert had handled the Keltec and that Defendant Moore had handled the Bersa. (Doc. 27 at 3-4).

**any other "personal property" contained in the vehicle**, such as the charging cables, clothing, sports equipment, wallet, CDs, or the subwoofer.  (*Id.*)  The impound report also noted, without specificity, pre-existing exterior damage to the vehicle, stating simply: "Back Bumper" and "Front (L) (R) Side."  (*Id.*)  Nothing was said about the damaged interior panel or the driver's side window (which would not roll down, as Defendant Torbert had informed Officer Strunk at the beginning of the stop).  (*Id.*; Doc. 30 at 53).

At Officer Webster's instruction, Officer Strunk administered *Miranda* warnings to Defendants at the scene.  (Webster Camera at 15:38).  Both Defendants stated at various times that they had no knowledge of the drugs or firearms.  (Doc. 27 at 3).  The vehicle was ultimately impounded and Defendants were taken to the Justice Center for booking.[14]  A citation was also issued to Defendant Torbert for driving under a non-compliance suspension, in violation of Ohio Rev. Code § 4510.16, as well as excessive window tints, in violation of Ohio Rev. Code § 4513.241.[15]

### III.  STANDARD OF REVIEW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …."  U.S. Const. amend. IV.  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—

---

[14] The footage appears to have been cut short when both officers turned off their body cameras before the incident concluded.

[15] The Ohio Revised Code sections cited are those which Officer Strunk selected in issuing Defendant Torbert's citation.  (Def. Ex. 4).

14

subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). The exclusionary rule serves to deter law enforcement from obtaining evidence by unconstitutional means. *Nix v. Williams*, 467 U.S. 431, 442-43 (1984). So critical is the goal of deterring violations of constitutional and statutory protections that exclusion is the appropriate remedy "notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes." *Id*. at 443 (emphasis added).

A defendant may seek the suppression of evidence by filing a pretrial motion with the court. Fed. R. Crim. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 F.App'x 449, 453 (6th Cir. 2014) (citing *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir.2003)). However, "[t]he Government has the burden of proof to justify a warrantless search." *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002); *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) ("The burden is on those seeking the exemption to show the need for it") (quotation marks and citations omitted).

15

# IV. ANALYSIS

Defendants move for suppression of all evidence obtained as a result of the warrantless search of the vehicle, arguing that: (A) the initial stop was improper; (B) the search of the vehicle was improper; and (C) the search was not otherwise justified by probable cause. (Docs. 24, 26, 32).[16]

## A. The Initial Traffic Stop

Defendants argue at length that the initial traffic stop was improper because Ohio's window tint statute (*i.e.*, the basis for the stop) is impermissibly vague. (Docs. 26, 32). Specifically, Defendants take issue with the language of Ohio Rev. Code § 4513.241, arguing that the statute's reliance upon a person of "normal vision" imposes too arbitrary a standard to give adequate notice of the prohibited conduct and, further, invites inconsistent and subjective application. However, Defendants' arguments fail for one critical reason. That is, Defendants cite to the wrong statute.

Specifically, Ohio Rev. Code § 4513.241, which Defendants argue is impermissibly vague, states in relevant part as follows:

> **The director of public safety … shall adopt rules governing the use of tinted glass**, and the use of transparent, nontransparent, translucent, and reflectorized materials in or on motor vehicle windshields, side windows, sidewings, and rear windows that prevent a person of normal vision looking into the motor vehicle from seeing or identifying persons or objects inside the motor vehicle.

---

[16] Defendant Moore raised an additional argument regarding his standing to contest the search, which the Government subsequently conceded. (Doc. 24 at 3; Doc. 30 at 5). Accordingly, the issue is moot.

16

Ohio Rev. Code § 4513.241(A) (emphasis added). Stated simply, <u>§ 4513.241 is not the tint law itself, but merely delegates the task of adopting a tint law</u> to the director of public safety.

The actual Ohio law which sets forth the specific parameters of permissible tinting is Ohio Admin. Code 4501-41-03. Section 4501-41-03 states:

> (A) **No person shall operate**, on any highway or other public or private property open to the public for vehicular travel or parking, lease, or rent **any motor vehicle that is required to be registered in this state with any sunscreening material**, or other product or material which has the effect of making the windshield or windows nontransparent or would alter the windows' color, increase its reflectivity, or reduce its light transmittance, **unless the product or material satisfies one of the following exceptions**:
> …
> (2) Any sunscreening material or other product or material applied to the **windshield … [which] has a light transmittance of not less than seventy per cent** plus or minus three per cent and is not red or yellow in color
> …
> (3) Any sunscreening material or other product or material applied to the **side windows to the immediate right or left of the driver … [which] has a light transmittance of not less than fifty per cent** plus or minus three per cent and is not red or yellow in color.

Ohio Admin. Code 4501-41-03(A)(2), (3) (emphasis added). Further, the City of Norwood's Codified Ordinance § 337.34 utilizes the precise language and specifications set forth in Ohio Admin. Code § 4501-41-03. And as defense counsel effectively concedes, and this Court agrees, a tint law which sets forth such specific transparency percentages (*e.g.*, 50% transparency for front windows, 70% transparency for front windshield, *etc*.) is constitutionally permissible. (*See* Doc. 35 at 3).

The Court acknowledges that Defendants' reliance on Ohio Rev. Code 4513.241 was prompted by the code's reference in the traffic citation issued by Officer Strunk to Defendant Torbert. However, the erroneous citation is not controlling here. Having identified the correct statutory citation, and having determined that Ohio Admin. Code 4501-41-3 (adopted by the City of Norwood in its Codified Ordinance § 337.34) sets forth a sufficiently specific standard, the Court finds that Defendants' arguments as to the constitutionality of Ohio's tint law is moot and, further, without merit.

Additionally, even if the Ohio tint law were found to be unconstitutionally vague, this Court does not agree that such a finding would invalidate the propriety of the initial traffic stop. "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Wren v. United States*, 517 U.S. 806, 810 (1996). "[T]his probable cause determination, like all probable cause determinations, is fact-dependent and will turn on what the officer knew <u>at the time he made the stop</u>." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis in original). Probable cause is not diminished simply because it is later discovered that no violation actually occurred. *Id.* Thus, as long as the law was in effect at the time of the traffic stop, subsequent invalidation of that law would not undermine the propriety of the traffic stop itself. At most, it would impact the propriety of the resulting violation, which, in this case, would be Defendant Torbert's window tint citation. However, the Court reiterates that Ohio's tint law, as set forth in Ohio Admin. Code § 4501-41-3, is sufficiently specific and is therefore valid.

18

The Court finds that Officer Strunk had sufficient probable cause to believe that Defendants were in violation of an existing and constitutionally valid traffic law (*i.e.*, excessive window tints), thereby permitting him to effectuate a traffic stop in order to issue a citation. Accordingly, the initial traffic stop was not improper.

**B. The Search of the Vehicle**

Defendants also argue that the search of the vehicle was unreasonable because: (1) the initial decision to impound the vehicle was in contravention of the NPD's tow policy; (2) the decision to impound was merely a pretext for the officers to gain access to the vehicle; and (3) the search conducted far exceeded the scope of a permissible inventory search.

A warrantless search is presumptively unreasonable unless a recognized exception to the warrant requirement applies. *Katz*, 389 U.S. at 357. To that end, "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). Indeed, "[i]t is settled law that the police may conduct an inventory search of an automobile that is being impounded without running afoul of the Fourth Amendment." *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012) (citing *United States v. Smith,* 510 F.3d 641, 650 (6th Cir. 2007)).

Discretion as to impoundment is permissible "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine,* 479 U.S. at 375–376 (emphasis added). Moreover, "[i]n order to be deemed valid, an inventory search may not be

19

undertaken for purposes of investigation, **and** it must be conducted according to standard police procedures." *Jackson*, 682 F.3d at 455 (quoting *Smith,* 510 F.3d at 651) (emphasis added).

Here, it is uncontested that the officers did not have a warrant to search the vehicle. Indeed, Officer Webster testified that the officers could have obtained a warrant, but chose not to because, "it wasn't necessary." (Doc. 31 at 56). Specifically, Officer Webster readily admitted that the inventory search served as the officers' "legal reason to enter the vehicle," but that, in truth, the intent was to "look for contraband while [we were] inventorying the vehicle." (*Id*. at 69).

### 1. The NPD Tow Policy Did Not Authorize Impoundment

Defendants argue that the officers' decision to impound the vehicle was in clear contravention of the NPD tow policy. Specifically, the NPD tow policy includes a section entitled "AUTHORIZATION TO IMPOUND A VEHICLE," which lists thirteen circumstances in which "officers are authorized to provide for the removal of a vehicle." (Def. Ex. 3 at 2) (emphasis added). Relevant here are the following:

> h. When any vehicle is left unattended either on public or private property due to the removal of an ill, injured **or arrested operator, and cannot be released to another or parked legally or safely**, or due to the abandonment thereof by the operator during or immediately after pursuit by a law enforcement officer. *An Impound Report is required.*
> …
> j. When any vehicle has been operated by a person who has been **arrested for a violation of ORC 4510.11 Driving under Suspension**, 4510.14 Driving While under OVI Suspension, or ORC 4511.203 Wrongful Entrustment of Motor Vehicle, and the vehicle is located upon a public street or other property open to the public for purposes of vehicular

travel or parking. (ORC 4510.41) *An Impound Report is required.*

(*Id.*) (bold emphasis added).

As to Provision (h), the body camera footage belies any claim that the vehicle could not have been "released to another or parked legally or safely." The vehicle was pulled to the curb in a residential neighborhood where parking was permitted and where other vehicles were lawfully parked. Indeed, both officers conceded during their testimony that the vehicle was legally parked and could have remained so without incurring a parking violation. (Doc. 30 at 47-48; Doc. 31 at 27). Alternatively, the officers could have allowed Defendant Moore to arrange for someone to pick up the car, including the registered owner of the vehicle, Jasmine Moore, as he expressly offered to do early in the stop. (Webster Camera at 1:45-1:53). Accordingly, Provision (h) did not authorize the impoundment of the vehicle.

As to Provision (j), the express language evidences that it was not applicable in the instant case. Specifically, Defendant Torbert violated Ohio Rev. Code § 4510.16 by driving while under an FRA suspension. However, while provision (j) lists certain offenses, including Ohio Rev. Code §§ 4510.11, 4510.14, 4511.203, it specifically excludes Ohio Rev. § 4510.16.

Regardless, the Government argues that impoundment of the vehicle was required under provision (j) because Ohio Rev. Code § 4510.11 (which is included in provision (j)) does not *exclude* a suspension for financial responsibility. However, the text of Ohio

21

Rev. Code § 4510.11(A) does not support the Government's argument. Specifically,

Ohio Rev. Code § 4510.11(A) states:

> Except as provided in division (B) of this section and in
> sections 4510.111 and 4510.16 of the Revised Code, no
> person whose driver's or commercial driver's license or
> permit or nonresident operating privilege has been suspended
> under any provision of the Revised Code, other than Chapter
> 4509. of the Revised Code, or under any applicable law in
> any other jurisdiction in which the person's license or permit
> was issued, shall operate any motor vehicle upon the public
> roads and highways or upon any public or private property
> used by the public for purposes of vehicular travel or parking
> within this state during the period of suspension unless the
> person is granted limited driving privileges and is operating
> the vehicle in accordance with the terms of the limited driving
> privileges.

(Emphasis added).

Thus, Ohio Rev. Code § 4510.16 is in fact specifically excluded under the plain

language of § 4510.11. Moreover, § 4510.11 generally excludes suspensions under

Chapter 4509 of the Revised Code, which chapter pertains to financial responsibility and

provides the basis for an FRA suspension under Ohio Rev. Code § 4510.16. In addition,

driving under suspension in violation of Ohio Rev. Code § 4510.11 is a first degree

misdemeanor. Ohio Rev. Code § 4510.11(D)(1). Conversely, pursuant to Ohio Rev.

Code § 4510.16(D), driving under an FRA suspension is an unclassified misdemeanor

and does not carry the possibility of jail time for a first offense.

Accordingly, the Government's assertion that Ohio Rev. Code § 4510.11 includes

violations of § 4510.16 is inaccurate.

Additionally, the language of provision (j) specifically states that impoundment is authorized under the following circumstances:

> When any vehicle has been operated by a person **who has been arrested for a violation** of ORC 4510.11 Driving under Suspension, 4510.14 Driving While under OVI Suspension, or ORC 4511.203 Wrongful Entrustment of Motor Vehicle …

Here, Defendant Torbert was not *arrested for* driving under suspension. Indeed, such an arrest would not have been authorized, as Defendant Torbert's license FRA suspension under Ohio Rev. Code § 4510.16 carries no jail time and, accordingly, is not an arrestable offense. Ohio Rev. Code § 4510.16(D)(1) ("the offense is an unclassified misdemeanor … the offender shall not be sentenced to a jail term").

Finally, as previously stated, *supra*, the relevant section of the NPD tow policy is entitled "AUTHORIZATION TO IMPOUND A VEHICLE," and it expressly provides circumstances under which "officers are authorized to provide for the removal of a vehicle." (Def. Ex. 3 at 2) (emphasis added). Accordingly, the Court rejects the Government's argument that the NPD tow policy was drafted to differentiate between circumstances when impoundment is required versus when it is discretionary, as the language evidences the policy's purpose in granting authority to impound. Additionally, the Government represented during the suppression hearing that the circumstances enumerated in provisions (a) through (l) of the NPD tow policy are the *required* impoundment provisions, whereas (m) is a *discretionary* impoundment provision. (Doc. 31 at 74). This representation leads the Court to assume that the Government misconstrues the final sentence of the policy provisions, which sentence refers to when an

impound <u>report</u> is required.  (Def. Ex. 3 at 2-4).  Specifically, the final sentence of provisions (a) through (l) states: "An Impound Report is required."  (*Id*.)  Conversely, the final sentence of provision (m) states: "An Impound Report is not required."  (*Id*. at 4).

Accordingly, the Court finds that the NPD tow policy, which was controlling on the officers' conduct, specifically identifies the circumstances under which impoundment is authorized.  Here, impoundment of the vehicle was in direct contravention of the NPD tow policy and, therefore, was improper.

### 2.  *The Officers' Decision to Impound the Vehicle was Improper*

 Beyond being unauthorized to tow the vehicle, Defendants also argue that the officers' decision to impound the vehicle was a pretext used merely to gain access to the vehicle.  The Court agrees.

In short, even assuming that the officers had some discretion as to whether to tow the vehicle, the officers' exercise of that discretion here was wholly improper.  **Officer Webster openly admitted that the decision to impound the vehicle was merely a pretext designed to provide an allegedly "legal reason" for the officers to search the vehicle under the guise of an inventory search**.  (*Id*. at 35-36, 49-51, 69-70).  However, the decision to tow a vehicle in the context of an inventory search must be based on "something other than suspicion of evidence of criminal activity."  *Bertine,* 479 U.S. at 375–376.  Here, there was no such valid basis.

As the officers' decision to tow the vehicle was impermissibly based upon their suspicion that criminal activity was afoot, and no other valid basis for the impoundment

24

existed, the Court finds that the decision to impound the vehicle, apart from lacking authority, also constituted an improper exercise of the officers' discretion.

### 3. Scope of the Inventory Search

In conducting an inventory search, officers are permitted to exercise a reasonable degree of discretion as to how to conduct the search without running afoul of the Fourth Amendment. *Jackson*, 682 F.3d at 455 (citing *Smith*, 510 F.3d at 650). An officer's "exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." *Jackson*, 682 F.3d at 455 (quoting *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007)) (emphasis added). For example, officers should be given "sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Florida v. Wells*, 495 U.S. 1, 4 (1990). However, "[a] general written inventory policy does not grant officers *carte blanche* when conducting a search; rather, it must be sufficiently tailored to only produce an inventory." *Jackson*, 682 F.3d at 455 (citing *Tackett,* 486 F.3d at 232) (emphasis added).

Here, the officers far exceeded the scope of a permissible inventory search. Indeed, while the officers acknowledged in their testimony that the purpose of the inventory search is to secure personal property and to note any pre-existing vehicular damage, the officers nonetheless failed entirely to list one single item of personal property on the impound report other than the contraband. (Def. Ex. 8). The fact that Officer Strunk spent several minutes (the entire time he was in the vehicle) searching just the front driver's seat of the vehicle further evidences that the search conducted was an

25

exhaustive attempt to locate hidden contraband and not a good faith attempt to protect personal property. Moreover, Officer Webster's exclamation of "Here it is, right here," upon finding the contraband indicates that he was actively looking for one thing—evidence.

The Government argues that the removal of the interior panel was permissible as part of an inventory search because the interior space behind the plastic paneling was a location where someone might have placed valuable personal property. The Government cites to, *inter alia*, the Sixth Circuit's decision in *United States v. Jackson*, 682 F.3d 448 (6th Cir. 2012), to support its proposition. The Court is entirely unpersuaded.

As an initial matter, the Government's argument is undermined by Officer Webster admission during his testimony that the hidden panel compartment would <u>not</u> be used to store personal property, but rather serves to conceal items, such as contraband. (Doc. 31 at 60-61).

Moreover, the Court finds the removal of the interior panel here to be distinguishable from cases such as *Jackson*, *supra*, where officers looked under torn carpeting or *United States v. Lumpkin*, 159 F.3d 983 (6th Cir. 1998), where officers looked in the engine compartment.[17] Specifically, items of personal property might accidentally become lodged under torn carpeting (*e.g.*, a lost earring, loose change, *etc.*). Similarly, a driver might have added aftermarket parts to the engine. In either case, the

---

[17] Notably, in *Jackson*, the Sixth Circuit approvingly quotes a Fifth Circuit case, stating that "we do not in any way condone searching under the carpeting in every case, much less the ripping apart of an automobile, or any part thereof, under the guise of an inventory search …." 682 F.3d at 456 (quoting *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978)).

26

search of those locations might in fact reveal items worth noting in an inventory search. Conversely, a skewed interior panel—notably one in the passenger's leg area, which has undoubtedly been kicked or bumped over time—is more likely to be an indication of vehicular damage than a compartment for storing personal property. Thus, an officer conducting an inventory **in good faith** would be <u>more</u> careful not to cause further damage by running his hand under the panel, thereby causing it to "pop right off," easily or not.

Finally, **the officers readily admitted that their search was conducted for the purpose of locating contraband** (Doc. 31 at 49-51) and the body camera footage amply evidences the same. Accordingly, the Court finds that the search conducted far exceeded the permissible scope of an inventory search and, accordingly, was conducted in violation of the Fourth Amendment.

### C. Probable Cause to Search

The Government argues in the alternative that the officers had sufficient probable cause, based upon their observations, to conduct a warrantless search of the vehicle under the automobile exception to the warrant requirement. The Court disagrees.

"Under the automobile exception to the warrant requirement, an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). "Probable cause is a reasonable ground for belief supported by less than *prima facie* proof <u>but more than mere suspicion</u>." *United States v. Blair,* 524 F.3d 740, 748 (6th Cir. 2008) (emphasis added). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part

of the vehicle and its contents that may conceal the object of the search." *California v. Acevedo*, 500 U.S. 565, 570 (1991) (internal quotation marks and citations omitted).

However, the officers had nothing more to rely upon than their belief that Defendants appeared nervous, the miscommunication in articulating the registered owner of the vehicle, and Officer Webster's observation of the sandwich bag box in the front console. This Court simply cannot agree that these factors rise to the level of probable cause, such that the officers were justified to conduct a warrantless search of the vehicle.

Accordingly, the officers' warrantless search of the vehicle was not supported by probable cause and was not permissible under the automobile exception.

## V.  CONCLUSION

In sum, the Court finds that while the initial traffic stop was valid, the officers impermissibly converted the stop into an unauthorized impoundment and warrantless search of the vehicle. The officers' decision to tow the vehicle was neither authorized by policy, nor an exercise of reasonable discretion. Additionally, the resulting search impermissibly exceeded the scope and purpose of an inventory search, and was nothing more than a thinly veiled pretext to justify the officers' warrantless intrusion into the vehicle. Finally, the Court finds that the officers lacked the requisite probable cause to conduct a search under the automobile exception and that no other recognized exception to the warrant requirement is applicable in the instant case.

Accordingly, the Court holds that the search of the vehicle in the instant case was unconstitutional under the Fourth Amendment and suppression of the evidence obtained

as a result of the unlawful search is proper.  Based upon the foregoing, Defendants'

motions to suppress evidence (Docs. 24, 26) are hereby **GRANTED**.

       **IT IS SO ORDERED.**

Date:  9/15/2016                          *s/ Timothy S. Black*    

                                              Timothy S. Black
                                              United States District Judge